**In re C. Richard SMITH and Linda R. Smith, Debtors-in-Possession.**

**Bankruptcy No. 94–10275.**

United States Bankruptcy Court, D. Vermont.

March 6, 1995.

C.D. Hickey, St. Johnsbury, VT, for Community Nat. Bank (Bank).

G. Glinka, Cabot, VT, for C. Richard Smith and Linda R. Smith (Debtors).

**Amended Memorandum of Decision on Appropriate Interest Rate to an Oversecured Creditor in a Chapter 12 Family Farmer Case**

FRANCIS G. CONRAD, Bankruptcy Judge.

This contested matter is before[1] us on Bank's objection to the interest rate Chapter

---

1. Our subject matter jurisdiction over this con- troversy arises under 28 U.S.C. § 1334(b) and

948

12 Debtors propose to pay on Bank's oversecured claim. We hold that neither of the two rates advanced by the contending parties appropriately compensate [2] Bank for the estate's detention of the property securing Bank's claim. We also came up empty handed after rummaging through the burgeoning literature and caselaw, searching for a theory or formula that would adequately account for the nature of the conflicting interests at stake and result in an interest rate that fairly compensates the oversecured creditor. Not only are the approaches we reviewed arbitrary, and unfair to one side or the other, but many are simply too hard to use, clogging up the Court's calendar and diverting the parties' resources. We are persuaded that much of the debate over appropriate interest rates is based on assumptions that don't stand up under scrutiny, and fails to focus on the interests at stake. Our hope is that by sketching out some of our concerns in broad strokes in this Memorandum of Decision, discussion and debate will become focused more narrowly on the fundamental issues at stake whenever interest is awarded to a secured creditor. Pending that dialogue within the bankruptcy community, however, our limited holding is that a Chapter 12 Plan must pay interest on the claim of an oversecured creditor at the rate prevailing on U.S. Treasury instruments of the same or similar term at the date of confirmation.

## FACTS

The facts are simple. Debtors filed a Chapter 12 petition on May 2, 1994. Debtors' first Plan of Reorganization, proposed to pay Bank's claim with interest at a 7.0% annual rate, amortized over 25 years. Full payment would be due in 10 years. Bank was to retain its lien on Debtors' farm, primary home, cattle, equipment, and crops. Bank is oversecured because the aggregate value of its collateral exceeds the amount

Debtors owe Bank. All objections to Debtors' Plan were resolved at the confirmation hearing, except for Bank's objection to the proposed interest rate. That objection was set down for an evidentiary hearing.

Prior to the evidentiary hearing, Debtors located an articulate expert and obtained discovery from Bank about Bank's cost of capital, which appeared to be low. Thus armed, Debtors squeezed Bank's legal and financial udders, amending their plan to lower the proposed rate of interest from 7.0% to 6.0%. At the evidentiary hearing, Debtors' expert provided one of the most interesting testimonials about interest rates this Court has ever received into evidence. The expert testified quite convincingly that Bank's cost of capital was 4.46 percent over the last five years, and 3.39 percent over the last year. The evidence was that Bank's cost of capital is higher than the cost to most other Vermont banks, though we were not told how much higher. One of Bank's witnesses essentially confirmed the testimony of Debtors' expert about Bank's costs. To this cost of capital, Debtor gratuitously added a 1.54 percent increase to reach its proffered 6% interest rate. No factual evidence was offered to support the 1.54 percent. In the words of Debtors' counsel, the increase was offered to ensure confirmation.

Although we found Debtors' expert to be credible and engaging, much of his testimony simply wasn't about interest rates. Rather, he testified about Bank's cost of capital and how Bank recovers overhead, credit risk, interest risk and profit. As we will explain later, except for interest risk, Bank is entitled to none of these components in bankruptcy. Moreover, we fail to understand why a federal system of bankruptcy intended to equitably apportion debtors' limited assets [3] should calculate interest to oversecured

the General Reference to the Court under Part V of the Local District Court Rules for the District of Vermont. This is a core matter under 28 U.S.C. § 157(b)(2)(A). This Memorandum of Decision constitutes findings of fact and conclusions of law under F.R.Civ.P. 52, as made applicable by Fed.R.Bkrtcy.R. 7052.

**2.** *See, e.g., Wright v. Union Central Insurance Co.,* 311 U.S. 273, 278, 61 S.Ct. 196, 199, 85 L.Ed.

184 (1940); 2 L. King, Collier on Bankruptcy, ¶ 361.01, 361–5, 361–6, 15th ed. (1994).

**3.** *See, e.g., Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 162–63, 67 S.Ct. 237, 240, 91 L.Ed. 162 (1946) (allowance of claims and distribution of a debtor's assets are determined by federal law in accordance with equitable principles).

creditors based on the creditors' own lending efficiency. Such a system would penalize efficient performers with low costs of capital and reward less efficient lenders with high costs of capital.

Bank's expert was also credible. This expert testified that Bank does not ordinarily offer its customers intermediate-term, fixed-rate loans like those Debtors were proposing—6.0% interest over ten years. Rather, Bank generally offers only variable rates on intermediate-term loans. In the circumstance of a debtor similar to the Debtors in this case, and because the loan would not be guaranteed by the Farmers Home Administration, Bank would offer a Federal Home Loan Bank rate, plus 3 percent and two points. This would effectively be a rate of 11 percent.[4] Although it is clear that Bank does not in fact customarily offer loans structured in the manner proposed by Debtor, Bank's evidence convinces us that the rate it proposes is a fair approximation of a market rate for similarly situated debtors. We have not been convinced, however, that a market rate should apply. Indeed, for the reasons set forth hereafter, we reject the use of a market rate for the award of interest to secured creditors.

Following the evidentiary hearing, we fixed interest to Bank at a rate of 7.29 percent, which was the prevailing Treasury rate for instruments of similar duration. We then confirmed the Plan, pending issuance of this Memorandum of Decision. The parties were directed to submit briefs appropriate to the issue at hand.

## DISCUSSION

The exercise we now undertake resembles the search of Diogenes the Cynic[5] for an honest man. Our search is for an honest interest rate, one that will further the goals of family farmer reorganization, while giving the oversecured creditor exactly the protection it is entitled to. To switch metaphors, like Goldilocks rummaging through the home of the three bears, we are looking for an interest rate that is not too high and not too low, but is "just right." Our hope is that such a rate will be easy to ascertain, providing certainty to the parties, and sparing Courts, creditors and debtors the expense and delay of prolonged evidentiary wrangling. We are confident there is such a rate, and that it is out there somewhere waiting to be found.

Our research has found this field well-plowed. Numerous Courts and commentators have written much on the subject[6] that

4. After hearing this testimony, a person should not be surprised about why Vermont had so few bank failures during the most recent wave of bank failures. Bank is obviously a bank that knows how to price risk and protect its shareholders.

5. Circa 430–325 B.C.

6. The numerous Treatises and Law Review Articles discussing cramdown and its interest rates include the following: *Advanced Chapter 11 Bankruptcy Practice*, Thomas J. Salerno & Craig D. Hansen eds., 2d ed. (1990); John C. Anderson, *Chapter 11 Reorganizations* (1983); *Bankruptcy Law and Practice*, Hon. William L. Norton, Jr. ed. (1982); Martin J. Bienstock, *Bankruptcy Reorganizations* (1987 & Supp.1989); Lawrence D. Cherkis & Lawrence P. King, *Collier Real Estate Transactions and Bankruptcy Code* (1984); *Collier on Bankruptcy*, Lawrence P. King ed., 15th ed. (1993); Michael L. Cook, *Bankruptcy Litigation Manual*, 2d ed. (1989); Patrick A. Murphy, *Creditor's Rights in Bankruptcy*, 2d ed. (1980); Robert J. Rosenberg, et al., *Collier Lending Institutions and the Bankruptcy Code* (1986); George M. Treister, et al., *Fundamentals of Bankruptcy Law*, 2d ed. (1989 & Supp.

1989); Walter J. Blum, *Treatment of Interest on Debtor Obligations in Reorganizations under the Bankruptcy Code*, 50 U.Chi.L.Rev. 430 (1983); James A. Belcher, *Cramdown under the New Chapter 12 of the Bankruptcy Code: A Boon to the Farmer, A Bust to the Lender?*, 27 Land & Water L.Rev. 227 (1988); Charles D. Booth, *The Cramdown on Secured Creditors: An Impetus Toward Settlement*, 60 Am.Bankr.L.J. 69 (1986); Richard F. Broude, *Cramdown and Chapter 11 of the Bankruptcy Code: The Settlement Imperative*, 39 Bus.Law. 441 (1984); C. Frank Carbiener, *Present Value in Bankruptcy: The Search for an Appropriate Cramdown Discount Rate*, 32 S.D.L.Rev. 42 (1987); David Gray Carlson, *Postpetition Interest Under the Bankruptcy Code*, 43 U.Miami L.Rev. 577 (1989); Peter F. Coogan, *Confirmation of a Plan Under the Bankruptcy Code*, 32 Case W.Res.L.Rev. 301 (1982); Thomas O. Depperschmidt & Nancy H. Kratzke, *The Proper Interest Rate for Allowed Secured Claims in Bankruptcy Proceedings: The Sixth Circuit in United States v. Arnold*, 21 U.Tol.L.Rev. 459 (1990); Thomas O. Depperschmidt, *Choosing the Proper Interest Rate in Bankruptcy Proceedings: Resolution of Special Issues in the Sixth, Eighth, and Ninth Circuits*, 18 N.Ky.L.Rev. 457 (1991);

is germane to the award of interest in a Chapter 12 case.[7] § 1225(a)(5). Most courts that have considered the issue hold, almost ecumenically, that a secured creditor is entitled to the market rate in the context of a cramdown.[8] Despite near unanimity on the standard, however,

> the case law with regard to an appropriate discount rate for cramdown purposes unfortunately has blossomed into a "many-colored splendor" of conflicting and sometimes indecipherable formulas as the courts have tried to implement the fact specific market analysis approach....

*In re Computer Optics, Inc.*, 126 B.R. 664, 671 (Bkrtcy.D.N.H.1991). Often, the justification cited is the "coerced loan" theory espoused by *Collier* and followed by many unsuspecting courts.

> It is submitted that a deferred payment of an obligation under a plan is a coerced loan and the rate of return with respect to such loan must correspond to the rate which would be charged or obtained by the creditor making a loan to a third party with similar terms, duration, collateral, and risk. It is therefore submitted that the appropriate discount rate must be determined by reference to the "market" interest rate.

5 *Collier on Bankruptcy*, ¶ 1129–03, p. 1129–99, 15th ed. (1994).

7. The award of interest to a secured creditor in Chapter 12 is mandated by § 1225(a)(5)(B), which requires as a condition of confirmation, that, absent the creditor's consent or surrender of its collateral,

> (ii) the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim....

The identical requirement is contained in § 1325(a)(5)(B)(ii) of Chapter 13.

The comparable section in Chapter 11, § 1129(b)(2)(A)(i)(II), requires:

> that each holder of a [secured claim] receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property....

Finally, § 506(b) requires:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

8. "Cramdown" is a term of art. Essentially, it means that under appropriate circumstances a Court may confirm a plan of reorganization over the objection of one or more creditors. Fittingly, the term was first used in a Vermont case, *In re New England Coal & Coke Co. v. Rutland R.R. Co.*, 143 F.2d 179, 190 (2d Cir.1944). The noun "cramdown" is derived from the verb form, "to cram down." When used as a noun, it should be one word rather than two. Cramdown is actually used far less than its use is threatened. More often than not, a debtor uses the threat of cramdown as a club to force settlement, rather than to force a contested confirmation hearing. In the instant case, Bank chose to take the blows.

Richard L. Epling, *Cramdown Under the Bankruptcy Code of 1978: Effect Upon the Soft Collateral Lender*, 12 Loy.U.Chi.L.J. 627 (1981); Jack Friedman, *What Courts Do To Secured Creditors in Chapter 11 Cram Down*, 14 Cardozo L.Rev. 1495 (1993); John A. Graham & Robert A. Greenfield, *Confirmation and Cramdown in Single–Asset Cases*. Los Angeles Bankr.F. (1990); Gary E. Klausner, et al., *Chapter 11—The Bank of Last Resort*, 45 Bus.Law. 261 (1989); Kenneth N. Klee, *Cram Down II*, 64 Am.Bankr.L.J. 229 (1990); Kenneth N. Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code*, 53 Am.Bankr.L.J. 133 (1979); Robert J. Kressel, *Calculating the Present Value of Deferred Payments Under a Chapter 12 Plan: A New Twist to an Old Problem*, 62 Am.Bankr.L.J. 313 (1988); Lynn M. LoPucki & William C. Whitford, *Preemptive Cram Down*, 65 Am.Bankr. L.J. 625 (1991); David K. McPhail, *Bankruptcy: Determination of an Appropriate Cram–Down Interest Rate for the Family Farmer*, 41 Okla.L.Rev. 489 (1988); Donald T. Polednak, *Is the Secured Creditor Really "Secure"?: A Survey of Remedies and Sanctions for a Debtor's Unauthorized Use of Cash Collateral in Chapter 11 Bankruptcy*, 31 Washburn L.J. 344 (1992); David K. McPhail, *Bankruptcy: Determination of an Appropriate Cram–Down Interest Rate for the Family Farmer*, 41 Okla.L.Rev. 489 (1988); Walter W. Miller, Jr., *Bankruptcy Code Cramdown Under Chapter 11: New Threat to Shareholder Interests*, 62 B.U.L.Rev. 1059 (1982); Isaac M. Pachulski, *The Cram Down and Valuation Under Chapter 11 of the Bankruptcy Code*, 58 N.C.L.Rev. 925 (1980); Waltraud S. Scott, *Deferred Cash Payments to Secured Creditors in Cram Down of Chapter 11 Plans: A Matter of Interest*, 63 Wash.L.Rev. 1041 (1988); Todd W. Ruskamp, *In the Interest of Fairness: Interest Payments in Bankruptcy*, 67 Neb.L.Rev. 646 (1988); J. Ronald Trost, *Business Reorganizations Under Chapter 11 of the New Bankruptcy Code*, 34 Bus.Law. 1309 (1979); Jonathan K. Van Patten, *Chapter 12 in the Courts*, 38 S.D.L.Rev. 52 (1993).

Judge Yacos' opinion in *Computer Optics* blames *Collier* for "[m]uch of the confusion" that "has skewed analysis ever since."

> Without citing any case or other authority that existed at the time, the Collier treatise in that comment took a quantum leap from the present value concept (in terms of the time value of money) into a totally different concept of a loan transaction involving fact specific risk analysis.

*Computer Optics, supra,* 126 B.R. at 671. We cannot improve on Judge Yacos' characterization. Simply put, *Collier* confused loans and claims. *Id.,* at 671–72. As a result, judges have been functioning as commercial loan officers, economists, and financial managers in their opinions, and not as the overseers of the reorganization process.

■ Courts are, as we have noted above, nearly unanimous that the appropriate interest rate is the market rate for similar loans. Nevertheless, the attempt by lawyers and judges, who are generally not economists, accountants, or experts in finance, to divine the correct market rate is a grueling exercise in self-impalement on concepts taken out of context. The attempt has spawned a myriad of mutually exclusive approaches producing rates that could never be found in the market. The attempt to award interest equivalent to the market rate for similar loans is doomed to produce chaos and confusion, we believe, because it starts with legal concepts that don't apply. More specifically, the search for the correct market rate for similar loans [9] is doomed for two reasons. First, there is no market for loans of this type. In most cases, a cerebral banker or lender would rather lend to a third-world country than make a prepetition loan to a borrower headed for bankruptcy. Although there is a growing market for trading claims in bankruptcy, the claims are generally traded at significant discounts, which confirms that there is in fact no market for loans equal in value to the amount of the claim. Second, these are not in fact loans, but secured claims; they arise out of loans which went bad, but they are in no sense of the word

"loans." A "claim" is a "right to payment," § 101(5)(A), "determine[d] . . . as of the date of the filing of the petition. . . ." § 502(b). A loan includes a contractual obligation to pay interest. The obligation to pay interest on a claim, by contrast, is statutory, not contractual, and the amount of interest should be determined by reference to the appropriate statute, not to the contract or market. Moreover, interest accruing on a loan prepetition is part of the claim in bankruptcy. The Code, however, does not provide for postpetition interest as part of the claim; rather, in some circumstances, it provides for interest on the claim. If we keep in mind the distinction between loans and claims, we can better appreciate the Code's requirements for interest on "claims."

In the text that follows, we briefly catalog the theories and approaches commonly used by the Courts to determine the appropriate rate of interest, and then discuss the theory we find produces the most appropriate rate for an oversecured creditor in a Chapter 12 case.

### Interest Rate Theories

Two basic approaches, each with many variations, are typically used by Courts to determine the correct rate of interest.

The testimonial approach is one option. The instant case exemplifies the far-flung sweep of the evidence introduced and the taxing complexities introduced by the testimonial approach, which may focus on anything from creditors' cost of funds, the cost to invest, and expert testimony about the appropriate market rate for similar loans, or, more accurately, what the appropriate rate would be if there were a market and claims were loans.

Variations of the testimonial approach that focus on the creditor's cost of funds can be either pro-debtor or pro-creditor. If the debtor is required to reimburse the creditor only for the transaction and other costs of acquiring funds to replace those funds not available because of the debtors's default, the position urged by Debtors here, the resulting

---

9. We use the term "loan" loosely. In bankruptcy there are no loans when we are talking about cramdown; there are only claims.

rate is, depending upon whom you represent, either neutral or pro-debtor. The creditor receives the cost-of-funds rate to replace the investment funds detained by the debtor and does not gain or lose from the deferred access to its collateral, and the debtor gets a low interest rate. See generally, Depperschmidt & Kratzke, *The Proper Interest Rate for Allowed Secured Claims in Bankruptcy Proceedings: The Sixth Circuit in United States v. Arnold,* 21 U.Tol.L.Rev. 459 (1990). If, however, the cost-of-funds rate is augmented by a premium that reimburses the creditor for its lost opportunity cost from use of those funds, i.e., its profit, the rate becomes pro-creditor.

The cost-of-funds approach, in both its variations, is usually rejected, as it should be. It is simply too difficult, costly, and time consuming to focus on a specific creditor. If this were a perfect economic world, the cost of funds to debtors and creditors would be the same, and would not have to be redetermined for each creditor in each case. But, alas, we do not live in a perfect economic world, and the cost of funds for each creditor in each case is *sui generis.* Moreover, the cost-of-funds and similar cost-of-capital approaches make our world even more imperfect by forcing debtors to provide interest rate subsidies to inefficient lenders with funds that would otherwise go to unsecured creditors. Indeed, the cost-of-funds approach should award an oversecured government creditor a rate approximating zero because government has the power to extort funds from its citizens at little or no cost.

More generally, a major difficulty of the testimonial approach is that it favors the side with the best lawyer and the most money. A well-funded, tenacious creditor can produce an expert on interest rates that will asphyxiate a Court in technical but cogent testimony. Similarly, a debtor with the resources to hire the biggest guns can entomb the creditor. Perhaps even worse than a one-sided massacre, is, as here, an evenly matched dispute between two articulate, well-prepared experts who testify on completely dif-

ferent wave lengths about mutually exclusive theories, neither of which has more to commend it than the other. Debtors were able to show, quite forcefully, that Bank's cost of funds was less than what Debtors were willing to offer. But what bankruptcy purposes are served by varying the rates debtors have to pay based on the efficiency of the creditor? Similarly, Bank successfully persuades us that if its claims were loans and there was a market for them, its rate would be the market rate. But they aren't and there isn't, so what possible justification can there be for picking a rate based on make believe? The testimonial approach is simply too unreliable, producing inconsistent, mercurial results from case to case. Moreover, it almost always increases transaction costs in bankruptcy, running up legal fees and stretching out the confirmation process. It bogs down the parties and the Courts in discovery, briefing, and evidentiary hearings. The testimonial approach is neither simple nor accurate.[10] Accordingly, unable to discover any redeeming virtue for the testimonial approach to determining the appropriate interest rate, we reject it in favor of the formula rate approach.

Formula rates begin with an interest rate used in some other context, including, *inter alia,* federal tax rate, federal or state legal rates, rates on consumer loans, Federal Land Bank rates, prime rate, rates paid by the U.S. Treasury on federal bills, notes or bonds, or an average of several of these rates. Whether the rate resulting is pro-creditor or pro-debtor depends upon the initial rate selected and whether and how much of a premium or kicker is added.

Perhaps the most obvious advantage of a formula rate approach is its inherent simplicity. Indeed, the fact that many of the most common formula rates can be determined by looking up a chart or index in *The Wall Street Journal* makes this approach, especially in light of the difficulties of the testimonial approach, a "calculation for the mathematically challenged." Among the criticisms of formula rates are that they do not reflect

---

**10.** *In re Cellular Information Systems, Inc.,* 171 B.R. 926 (Bkrtcy.S.D.N.Y.1994) illustrates the complexities of the testimonial approach.

current economic conditions, or the financial circumstances of the debtor before them. Some formula rates, particularly those fixed by state or federal statute, do not, in fact, reflect current economic conditions. But the most popular formula rates, like the prime or U.S. Treasury rates, are extraordinarily current and sensitive to existing economic conditions.

■ The second major criticism of formula rates—that they are essentially risk-free rates while debtor loans (creditor claims) are not risk free—is irrelevant and untrue. Moreover, we find no statutory authority for the pro-creditor upward adjustments frequently made in response to this criticism. Consider, for example, the prime rate, which is often chosen because it is supposed to encompass all the elements that affect the market rate of interest on a current basis in a commercial setting. The rate includes profit, risk, costs of administration, and collection costs, etc. Creditor-side critics are quick to point out that the prime rate is theoretically concocted to apply to low-risk borrowers and not to high-risk [11] debtors-in-possession. Accordingly, many Courts, recognizing that debtors are not risk-free, add to the basic formula rate an additional risk premium that is usually arbitrary and inappropriate to a debtor's financial position.[12] Though it is simple, just adding an upward adjustment of one or two or X percent because a Court thinks it is fair, is no reason to add a premium to which the creditor is not entitled. The problem with the prime rate, moreover, is not that it is too low, but that it is too high. The Bankruptcy Code simply does not require that reorganization plans provide secured creditors with their contractual profits, protection from risk, collection costs, etc. Rather, it requires only that creditors receive the present value of their claims. *Computer Optics, supra,* 126 B.R. at 671.

The U.S. Treasury rate for an instrument of similar term, frequently with an upward adjustment, is another popular formula rate. No case we read that has chosen the Treasury rate, however, adequately discusses the rational for using it. Nor has there ever been, in any of the cases, an effective discussion of the fact that applying a Treasury rate to plan payments actually increases the effective discount rate to a creditor because the payment terms of a Treasury instrument differ from those of a plan. For the reasons discussed hereafter, we believe that the Treasury rate for an instrument of similar term, although it slightly overcompensates the creditor, comes as close as we can get in an imperfect economic world to an interest rate that is "just right."

■ Use of the contract rate is claimed by its proponents to be the best way to determine the market rate because it is usually at arms length and presumably reflects current interest rates, the current cost of money, and accounts for risk and costs. These arguments sink in the Bankruptcy Code waters because Courts do not award profit, administration costs, risk, industry transactional costs, costs of collection, and all those other myriad elements that go into a contract rate. Moreover, the Code authorizes a debtor to change its creditors' contract rights. §§ 1123(b)(1), 1222(b)(2), 1322(b)(2). The worst fault we find with the contract rate, is that it usually doesn't reflect the financial reality of the debtor before the Court.

■ The variable rate method is exactly that, a method, not a theory. Any of the above discussed theories can be selected and a variable rate applied to them. This method is rationally appropriate in a period of rapid and unstable interest rate fluctuations because payments under a plan should accommodate future interest rate changes. But

11. Some would argue that a debtor-in-possession is a low risk because Bankruptcy Judges pass on the feasibility of a debtor's plan of reorganization. One should not use this benediction on feasibility by a Bankruptcy Judge, however, to leap to the conclusion that a debtor is riskless.

12. The cost of importing rhyme and reason to calculation of the upward premium is probably

not worth the trouble. It would introduce the testimonial approach into the formula rate inquiry, requiring discovery, briefs, and evidentiary hearings to determine how the market would assess a particular debtor's risk and what premium it would require. Our eyes glaze over at the prospect.

unstable interest rate periods are rare in the United States. In a Chapter 12 case, the method is normally inappropriate because the plan terms are usually for short or intermediate periods. A criticism of the variable method is that it is impossible to do a liquidation analysis because it is difficult to determine future interest rates, and this complicates the determination of the feasibility of a debtor's plan of reorganization. This criticism is without merit. Debtors make financial assumptions all the time. The assumption of future interest rates would be just another assumption subject to judicial inquiry. The actual calculation is simply the present value of an uneven stream of payments.

### Interest Rates

There are many types of markets where people and organizations wanting to borrow money are brought together with those who have ample surplus funds. Such markets include money, capital and mortgage markets, and consumer credit markets, to name just a few. A bankruptcy loan market is nowhere among them. Why? Because in bankruptcy, prepetition loans become claims. There is no additional money to lend in bankruptcy. Thus, there is no bankruptcy "claim" capital market per se.[13] How then do we determine the appropriate interest or discount rate on a claim in bankruptcy?

Capital in a free economy is allocated through the price system. Interest is the price paid to borrow capital. The two fundamental factors that affect the cost or price of money are (1) production opportunities, and (2) the time preferences for consumption. The term "production opportunity" is a jargonistic term for savings that are invested while foregoing present consumption. The investment of savings, if all goes as presented, should result in a return on the savings that is greater than the production opportunity foregone. "Time preference" simply refers to current versus future consumption.

The price system allocates capital among firms by interest rates. It is simply a function of supply and demand that lowers costs for efficient firms and raises costs for inefficient firms. Were we living in a perfect world, interest rates would always reward the perfect and punish the imperfect. We do not, however, live in a perfect world. Thus, our Federal Government, in the guise of Congress, frequently rewards certain individuals and groups (some people would call them special interest groups) with favorable rates. Debtors under Title 11 of the United States Code are among those singled out for special treatment.

Our capital markets are interdependent. A shift in any one of the numerous markets results in a shift in interest rates in the other markets.[14] Thus, there is a price for each type of capital desired. These prices, of course, change over time. The markets are not static. But history tells us that over time interest rates in the capital markets of the United States have been relatively stable. As a result of this stability, and the numerous studies and research of economists and financial experts, we do know, in a theoretical sense, what an interest rate is composed of.

In general, interest is composed of (1) pure interest, (2) an inflation premium, (3) a default premium, (4) a liquidity or marketability premium, and (5) a maturity or risk premium.[15]

The pure rate, also known as the real or risk-free rate is thought to be the rate of interest in an inflation-free and risk-free world. U.S. Treasuries are thought to be, and often are referred to as being, risk-free. They are not. A more appropriate term for Treasuries would be "pure rate securities," adjusted for inflation and maturity premiums. The default premium in a Treasury rate is, if not completely absent, at least incalculably small. The Treasury rate is, we

---

13. We recognize that there is a market where claims are bought and sold. We are using the term "market" in the sense that it is an excess funds market where a borrower and lender can reach an agreement on a loan.

14. A recent example is the Mexican "peso crisis," which adversely affected Latin American capital markets.

15. Any number of current topical texts on economics and finance will produce this same analysis. We recommend J. Fred Weston and Eugene F. Brighan, *Essentials of Managerial Finance,* 10th ed. (1990).

believe, the appropriate rate because it includes the components of interest to which an oversecured creditor is entitled—pure interest, inflation, and liquidity premiums, while eliminating the components to which the creditor is not entitled, principally the default premium.

█ Inflation erodes purchasing power. If during the loan term, inflation races beyond the real rate of interest, an investor is worse off when the loan is paid because purchasing power of the received amount has decreased. Investors add an inflation premium to guard against this risk. A secured creditor in Chapter 12 is entitled to an inflation premium in order to receive its statutory due—"value, as of the effective date of the plan, . . . not less than the allowed amount of such claim." § 1225(a)(5)(B)(ii).

█ The risk that a borrower or debtor will default also affects the market interest rate on a debt security. The greater the default risk the higher the default premium. U.S. Treasuries are deemed default free. The difference between the interest rates on a Treasury, and that of some other debt instrument from another market, with similar maturity and liquidity, is usually the default premium. The Code makes no provision for a default premium. Indeed, the attempt to provide one protects the creditor from what has in fact happened. Although it is often forgotten, bankruptcy is a default. *See, e.g., Central Trust Co. v. Chicago Auditorium Association,* 240 U.S. 581, 592, 36 S.Ct. 412, 415, 60 L.Ed. 811 (1916) ("proceedings, whether voluntary or involuntary, resulting in an adjudication of bankruptcy, are the equivalent of an anticipatory breach"); H.R.Rep. No. 595, 95th Cong., 1st sess. 353 (1977), U.S.Code Cong. & Admin.News 1978, 5787, 6308–6309, reprinted in *Norton Bankruptcy Code Pamphlet,* 1994–95 ed. (revised), p. 374 (bankruptcy operates as the acceleration of the principal amount of all claims against the debtor). The object of the default premium in the prepetition contract rate of interest was to protect the creditor from the risk of default. We seen no reason

to protect creditors from what has in fact happened. Awarding a default premium on the claim of secured creditors is like making the farmer's other creditors insure the barn after it's burned. Moreover, the statute clearly separates out the issues of risk and interest. Under § 1225(a)(5)(B)(ii), the creditor is entitled only to the present value of its claim. Risk enters the picture under § 1225(a)(6), which requires the Court to find that "the debtor will be able to make all payments under the plan and to comply with the plan."

Accountants define liquidity as the ability to liquidate an asset or pay off a liability at a fair price within one year. If a security or debt instrument is illiquid or is perceived not to be liquid, then investors demand a liquidity premium. Liquidity premiums are almost impossible to measure because they are so subjective to the investor. For example, just recall the two fundamental factors that affect the cost of money, production and preference, and one can understand why this premium is difficult to quantity.

Maturity premiums are a little easier to measure and approximate than liquidity premiums. Treasuries are assumed to be free of default and easy to liquidate. Theoretically, a Treasury rate is risk and default free, and adjusted for inflation. But they too are adjusted for maturity. The farther out in time the maturity, the higher the risk the instrument will not be paid. This is simply the risk that no one can predict the future. The maturity risk can be appreciated by comparing short and long-term interest rates.

In addition to the components of an interest rate, there are many structures and factors that affect interest rates. Some of these include [16] market segmentation, liquidity preference expectations, emergency liquidation preferences, the Federal Reserve,[17] federal deficits, business cycles, and the relationship among the various stocks and bond markets.

█ What does all this mean to creditors and debtors in bankruptcy? In a perfect

---

**16.** We do not presume to state that we have listed the entire universe of factors and structures that affect interest rates. If we could, we

would trade the robe for a more lucrative endeavor.

**17.** At the time of the writing of this Memorandum, the Federal Reserve has raised the rate it

bankruptcy world, a debtor-in-possession and a creditor would come to agreement on the perfect discount rate for every creditor's claim in bankruptcy. That is, they would arrive at a claim position that allows a debtor to survive and a creditor to earn an appropriate return on the claim in any future interest rate environment. We are not perfect. Thus, we provide the imperfect, but most likely the best, solution. We hold that a Treasury rate, without any premium or kicker, which best matches the maturity of an oversecured creditor's claim is the rate a debtor in a Chapter 12 case should provide.

Our holding reflects a balance of what is in the best interest of creditors and debtors, and surely reflects Congressional intent. The intent of the Code is to give a debtor a fresh start, and to protect a creditor's interest in its claim. Interest rates can determine the success or failure of a debtor's plan of reorganization. We have a Bankruptcy Code to reorganize debtors, not to trample them to financial death with high interest rates. On the other hand, we have the Code to ensure that creditors' claims are treated fairly. Low rates would deprive creditors of their claims and more then likely affect the financial markets as a whole. An appropriate and easily ascertainable interest rate facilitates efficiency and fair outcomes with minimal Court involvement. It also allows the parties to focus on the feasibility of the future reorganized debtor rather than on its financial past. See generally, Scott, *Deferred Cash Payments to Secured Creditors in Cram Down of Chapter 11 Plans: A Matter of Interest,* 63 Wash.L.Rev. 1041 (1988).

An interest rate using a Treasury rate provides a discount or interest rate that reflects maturity and inflation premiums.[18] It is simple to compute. It is efficient. It reduces complexity. It will provide a threshold test that will require debtors and creditors to focus on feasibility and claim valuation. It is predictable. It will enable financial markets to adjust to bankruptcies. Additionally, a creditor will normally get a dis-

count kicker in a typical Chapter 12 because the payments are made monthly. This results in a faster prepayment of principal and, in turn, a discount rate that is actually slightly higher than the Treasury rate, because Treasury instruments are paid every six months or annually. This better return is a given, but it can be calculated on any calculator or computer with a discount program. Accordingly, Debtor is to amend its Chapter 12 Plan of Reorganization to provide Bank with a discount or interest rate equal to the rate prevailing on the Treasury instrument closest in maturity as of the confirmation hearing date.

Debtor's counsel to settle an order within five days.

---

charges to member banks seven times in one year.

**18.** In our research, we found a case that added a 10% inflation premium after finding the Treasury

rate to be the appropriate rate. The Court's failure to understand that Treasury rates already include inflation premiums imposed a severe financial penalty on the debtor.