218 B.R. 718 (1998)
In re Gilbert R. and Sandra Sue GOODYEAR, Debtors.
In re Stephen and Janice LINEHAN, Debtors.
Bankruptcy Nos. 94-10645, 96-10014.
United States Bankruptcy Court, D. Vermont.
February 3, 1998.
M. Palmer, Palmer Legal Services, Middlebury, VT, for Debtors.
C. Reis, Hull, Webber & Reis, Rutland, VT, for Merchants Bank.

MEMORANDUM OF DECISION DENYING DEFAULT PREMIUM
FRANCIS G. CONRAD, Bankruptcy Judge.
Changes in the applicable decisional law *719 require us to revisit[1] the issue of what interest rate must be paid to secured creditors whose objections to confirmation are "crammed down." Both of the two Chapter 12 cases covered by this Memorandum of Decision are back in front of us on remand after appeals by Bank. In each case, "[p]ursuant to [our] policy as set forth in In re Smith, 178 B.R. 946 (Bankr.D.Vt.1995), [we] imposed, without any premium, the interest rate prevailing on the United States Treasury instrument closest in maturity as of the plan confirmation hearing date." Merchants Bank v. Goodyear, Civ. No. 1:96CV105 (D.Vt. March 10, 1997). Smith holds, for a plethora of reasons that boil down to efficiency and entitlement, that the Treasury rate is "the appropriate rate because it includes the components of interest to which an oversecured creditor is entitledpure interest, inflation, and liquidity premiums, while eliminating the components to which the creditor is not entitled, principally the default premium." Smith, supra, 178 B.R. at 954.
While the appeals were pending, the Second Circuit decided In re Valenti, 105 F.3d 55 (2d Cir.1997), a Chapter 13 case which addressed two issues critical to our determination of this matter. The first issue addressed was valuation of collateral, which is necessary to determine the amount of the creditor's secured claim under § 506(a).[2] The second issue addressed in Valenti was the rate of "interest" that debtors must pay on secured claims under a Plan of Reorganization to provide the secured creditor with "value, as of the effective date of the plan, [which] is not less than the allowed amount of such claim." § 1325(a)(5)(B)(ii).[3]
Valenti upheld Smith's positions on efficiency and entitlement in interest rate determinations in several important respects, even citing it as authority. First, Judge Parker repudiated the "coerced loan" theory, with its egregiously wrongheaded notion that secured creditors are entitled to profit on their claims in bankruptcy. Valenti, supra, 105 F.3d at 63-64. The Collier treatise, 5 Collier on Bankruptcy, ¶ 1129-03, p. 1129-99, 15th ed. (1994), fabricated this theory from whole cloth, "`[w]ithout citing any case or other authority that existed at the time,'" and it "`has skewed analysis ever since.'" Smith, supra, 178 B.R. at 950-51, quoting, In re Computer Optics, Inc., 126 B.R. 664, 671 (Bkrtcy.D.N.H.1991). Second, Valenti rejected the "cost of funds" approach for efficiency reasons:
This approach . . . is difficult for bankruptcy courts to apply efficiently and inexpensively. Because individual creditors borrow funds at different rates, bankruptcy courts would have to conduct evidentiary hearings to determine a creditor's cost of funds on a case-by-case basis. In addition, bankruptcy courts using a "cost of funds" approach are likely to treat debtors inequitably. [D]ebtors would be charged different interest rates depending upon *720 how much their respective creditors have to pay for funds.
Valenti, supra, 105 F.3d at 64. Finally, Judge Parker held that interest "should be fixed at the rate on a United States Treasury instrument with a maturity equivalent to the repayment schedule under the debtor's reorganization plan."
This method of calculating interest is preferable to either the "cost of funds" approach or the "forced loan" approach because it is easy to apply, it is objective, and it will lead to uniform results. In addition, the treasury rate is responsive to market conditions.
Id., at 64.
Valenti, however, did reject a major premise of Smith. It required default premium. Smith held that none is permitted.
The Code makes no provision for a default premium. Indeed, the attempt to provide one protects the creditor from what has in fact happened. Although it is often forgotten, bankruptcy is a default. See, e.g., Central Trust Co. v. Chicago Auditorium Association, 240 U.S. 581, 592, 36 S.Ct. 412, 415, 60 L.Ed. 811 (1916) ("proceedings, whether voluntary or involuntary, resulting in an adjudication of bankruptcy, are the equivalent of an anticipatory breach"); H.R.Rep. No. 595, 95th Cong., 1st Sess. 353 (1977), U.S.Code Cong. & Admin.News 1978, 5787, 6308-6309, reprinted in Norton Bankruptcy Code Pamphlet, 1994-95 ed. (revised), p. 374 (bankruptcy operates as the acceleration of the principal amount of all claims against the debtor). The object of the default premium in the pre-petition contract rate of interest was to protect the creditor from the risk of default. We see no reason to protect creditors from what has in fact happened. Awarding a default premium on the claim of secured creditors is like making the farmer's other creditors insure the barn after it's burned. Moreover, the statute clearly separates out the issues of risk and interest. Under § 1225(a)(5)(B)(ii), the creditor is entitled only to the present value of its claim. Risk enters the picture under § 1225(a)(6), which requires the Court to find that "the debtor will be able to make all payments under the plan and to comply with the plan."
Smith, supra, 178 B.R. at 955.
Valenti unambiguously overruled us, on this point.
Because the rate on a treasury bond is virtually risk-free, the § 1325(a)(5)(B)(ii) interest rate should also include a premium to reflect the risk to the creditor in receiving deferred payments under the reorganization plan. A review of the caselaw in those jurisdictions that use this approach to determine a fair rate of interest suggests that the risk premium has been set by bankruptcy courts at from one to three percent. The actual rate will depend upon the circumstances of the debtor, including prior credit history as well as the viability of the reorganization plan. We hold that a range of one to three percent is reasonable in this circuit but leave it to the bankruptcy court in the first instance to make a specific determination. If the parties are unable to stipulate to the applicable risk premium, then the bankruptcy court may conduct a hearing limited solely to a determination of that premium.
Valenti, supra, 105 F.3d at 64.
We are, obviously, bound by the determinations of the Second Circuit, and ordinarily would swallow our reservations about the holdings of the higher court without comment. The procedural postures of these cases, however, warrant a couple of observations about Valenti's requirement of a default premium. We note first that we shudder at the prospect of conducting hearings "limited solely to a determination of that premium," when the outcome depends upon "the circumstances of the debtor, including prior credit history as well as the viability of the reorganization plan." Id. This is not in fact a limited hearing at all, but a full-blown trial on feasibility made even larger by the inquiry permitted into debtors' pre-petition history, which is ordinarily off limits. It would, we believe, be far more efficient to conduct hearings on the creditor's cost-of-funds, which the Second Circuit rejected for efficiency reasons. Second, the costs of such a procedure will most often be way out of line *721 with any conceivable benefit to the parties. A three percent default premium on the $7,850 secured claim of the creditor in Valenti, for example, would yield the creditor only $235.50 a year. Third, bankruptcy is a zerosum game. More for one creditor means less for someone else. We have yet to come across any plausible argument that secured creditors are statutorily entitled to a default premium. Finally, Valenti's approach to the default premium requires a case-by-case determination, just like its approach to valuation. The Supreme Court specifically rejected this approach to valuation in Rash, to which we now turn, for reasons that apply as well to determination of interest rates.
After Valenti was decided, the District Court remanded the Goodyears' case and the Bankruptcy Appellate Panel remanded the Linehans' case.[4] We were instructed in each case to revisit the question of interest in light of Valenti. While the remands were pending, however, the U.S. Supreme Court released its opinion in Associates Commercial Corp. v. Rash, ___ U.S. ___ 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997). That decision controls our determination here in two important respects. First, Rash, "reject[ed]" Valenti's "ruleless approach allowing use of different valuation standards based on the facts and circumstances of individual cases." Id., ___ U.S. at ___ n. 5, 117 S.Ct. at 1886 n. 5. Instead, the Court said, "`a simple rule of valuation is needed' to serve the interests of predictability and uniformity." Id., ___ U.S. at ___, 117 S.Ct. at 1885 (citations omitted). Valenti's holding on how to determine the appropriate risk factor is also a "ruleless approach," and is thus subject to the same infirmities as its holdings on valuation. More importantly, however, Rash shifted compensation for the risk of default from the "interest" component of "value" to the valuation component. The Supreme Court explicitly addressed the risks run by secured creditors whose collateral is retained and used by a debtor.
When a debtor surrenders the property, a creditor obtains it immediately, and is free to sell it and reinvest the proceeds. . . . If a debtor keeps the property and continues to use it, the creditor obtains at once neither the property nor its value and is exposed to double risks: The debtor may again default and the property may deteriorate from extended use. Adjustments in the interest rate and secured creditor demands for more "adequate protection," 11 U.S.C. § 361, do not fully offset these risks.
Id., ___ U.S. at ___, 117 S.Ct. at 1886 (citations omitted). Unlike interest rate adjustments, which "do not fully offset these risks," "the replacement-value standard accurately gauges the debtor's `use' of the property." Id. If the risks of depreciation occasioned by a debtor's retention and use of the collateral are "accurately gauge[d]" in the valuation process, then there is no occasion to provide additional compensation for the same risk when determining the appropriate interest rate.
With this background out of the way, we now affirm ourselves in light of Valenti and Rash for two independent reasons. First, we do not believe Valenti applies to either of these two cases. The secured creditor in Valenti was underwater, and its collateral was valued at the mid-range between wholesale and retail values. Here, by contrast, Bank is comfortably oversecured in both these pending cases.[5] Accordingly, Valenti does not apply, and no risk premium is appropriate. Alternatively, we hold that because Bank is oversecured, the appropriate risk premium is 0 percent.
The second reason we affirm ourselves is that Rash created a new context in which to *722 understand the issues, and made it possible for us to harmonize the various values articulated by Smith and Valenti. All three cases make it abundantly clear that efficiency and predictability in the resolution of contested issues is an important consideration. Valenti and Rash each also make it patently clear that bankruptcy courts must recognize and award secured creditors compensation for their heightened risk where debtors propose to retain and use the collateral. Valenti said the means to that end is by including a default premium in the interest rate. Rash requires that the risk premium be considered in connection with the valuation of collateral. Because use of the "replacement value standard accurately gauges the debtor's `use' of the property," an additional default premium would give creditors more than they are entitled to. Rash, supra, ___ U.S. at ___, 117 S.Ct. at 1885. Accordingly, having reviewed our decisions in these two cases in light of Valenti and Rash, we conclude that the interest rates should remain as originally imposed, with no default premium.
NOTES
[1] Our subject matter jurisdiction over this controversy arises under 28 U.S.C. § 1334(b) and the General Reference to this Court under Part V of the Local District Court Rules for the District of Vermont. This is a core matter under 28 U.S.C. §§ 157(b)(2)(A), (B), (L), and (O). This Memorandum of Decision constitutes findings of fact and conclusions of law under Fed.R.Civ.P. 52, as made applicable by Fed.R.Bkrtcy.P. 7052.
[2] Section 506(a) provides, in pertinent part, as follows:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.
[3] Although Valenti was a Chapter 13 case, the relevant statutory language is substantively identical in both Chapters 12 and 13. In each Chapter, confirmation of a 13 Plan requires, inter alia, that "with respect to each allowed secured claim provided for by the plan . . . the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim." The only difference in language between the two provisions is that Chapter 12 contains the italicized phrase and Chapter 13 does not. We hold that this difference in language is not significant.
[4] The District Court's remand order appears in Merchants Bank v. Goodyear, Civil No. 1:96CV105, slip op. at 2 (D.Vt. March 11, 1997) (Murtha, C.J.). The BAP remand, based on a stipulation between the parties, appears at In re Linehan, No. 96-50035, slip op. at 1 (2d Cir. BAP April 15, 1997) (Gallet, B.J.).
[5] The basis of our finding that Bank is comfortably oversecured in both cases is not as clear-cut as we'd like. It is based on the entire record, and in particular the fact that both Debtors' counsel and the Chapter 13 Trustee alleged that Bank was oversecured at the combined hearing on remand. Bank has consistently declined to address the issue or contest valuation. Accordingly, we find that Bank is oversecured in both cases.