**In re Thomas M. & Michelle L. DINGLEY, Debtors.**

**Bankruptcy No. 95–11927.**

United States Bankruptcy Court, N.D. New York.

Nov. 29, 1995.

**266**

Arcus & Goldstein (Rebecca Herman, of counsel), Albany, NY, for debtors.

Deily, Testa & Dautel (Martin A. Mooney, of counsel), Albany, NY, for Chrysler Credit Corp.

Andrea E. Celli, Trustee, Albany, NY.

O'Connor & O'Connor, Michael J. O'Connor, Albany, NY, Parisi, Englert, Stillman, Coffey & McHugh, Peter B. McHugh, Schenectady, NY, amicus brief.

## MEMORANDUM DECISION AND ORDER

ROBERT E. LITTLEFIELD, Jr., Bankruptcy Judge.

This matter is before the court by way of objection filed by the Chapter 13 Trustee ("Trustee") to confirmation of the Chapter 13 plan filed by Thomas and Michelle Dingley ("Debtors"). This matter is within the court's core jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(L), (O).

## FACTS

On May 18, 1995 the Debtors filed their joint voluntary petition seeking relief under Chapter 13 of the Bankruptcy Code (11 U.S.C. §§ 101–1330 hereinafter the "Code"). As of their petition date the Debtors were obligated to Chrysler Credit Corporation ("CCC") under a retail installment contract which debt was secured by Debtors' vehicle. The contractual rate of interest was fixed at 12.85%.

The Debtors filed a plan in which they propose to pay CCC the agreed value of its secured claim ($11,000) in full over sixty months at 11% interest.[1] The Debtors also

---

1. There is no dispute that CCC is undersecured. Accordingly, its secured claim is less than the total amount due under the contract.

propose to pay 10% on all allowed unsecured claims. A confirmation hearing was conducted on October 2, 1995 at which the court heard oral argument. The court reserved decision and the parties submitted briefs.

The Trustee objects to confirmation of the plan. She argues that CCC's secured claim is excessive (according to the Debtors' schedules) and that the proposed 11% interest rate on CCC's secured claim exceeds the 9% rate "customarily agreed upon." (Trustee's Objection at ¶ 8). The Trustee contends that the increased interest rate paid on CCC's secured claim correspondingly reduces the distribution on unsecured claims. In effect, the Trustee argues that the Debtors' proposal to pay CCC more than present value on its secured claim while paying only 10% to their unsecured creditors is inconsistent with the good faith requirement under Code § 1325(a)(3).

CCC argues that it is entitled to a rate of interest on its secured claim "otherwise charged by that creditor on a loan of similar nature." (Affidavit of James Clark sworn to on October 16, 1995 at ¶ 10). CCC asserts that, based upon its lending criteria, it would not make a voluntary loan to the Debtors for less than 15.10%. (*Id.* at ¶¶ 7–10). CCC also opposes confirmation of the plan.[2]

### DISCUSSION

With regard to the amount of CCC's secured claim, the Trustee has separately sought a valuation of the collateral which will result in fixing CCC's secured claim. Accordingly, the amount of CCC's secured claim shall be separately determined and will not be considered further herein. *See* Code § 506(a). Therefore the only remaining issues before the court are whether the Debtors' proposal in their plan to pay CCC's secured claim with 11% interest comports with treatment required under Code § 1325(a)(5)(B)(ii) and, in the event that Debtors propose to pay CCC more than that to which it is entitled, whether Debtors' plan should be confirmed over the Trustee's "good faith" objection.

I.

 Code § 1325(a)(5)(B)(ii) provides that the holder of an allowed secured claim is entitled to the "present value" of the allowed amount of such claim as of the effective date of the plan.[3] The intended purpose of the present value requirement is "to place the holder of an allowed secured claim in the same position economically as if the debtor ... received in full immediately upon confirmation" the amount of the secured claim and to compensate the creditor if it must obtain the funds elsewhere. 5 King, L., COLLIER ON BANKRUPTCY ¶ 1325.06[4][b][iii] at 1325–50 (15th ed. 1995). Where a debtor proposes deferred cash payments to a secured claim holder over the term of the plan, the present value provision requires the application of a discount or interest rate (the terms are used synonymously herein) to compensate the claim holder for the delay in receiving the full amount of the allowed secured claim immediately upon confirmation. *Id.* Unfortunately, Congress did not provide guidance concerning how the bankruptcy

---

2. CCC filed both a Response to Trustee's Objection and a post-hearing Supplemental Response, Affidavit in Support of Objection and Memo of Law. While the court construes CCC's position as opposing confirmation, CCC's position has been inconsistently stated in the above papers. It supports confirmation in its original Response, opposes confirmation in the Clark affidavit, supports confirmation in its Supplemental Response and argues in its Memo of Law that it is entitled to either the contract rate of interest or a greater rate if evidence indicates that CCC would extend credit voluntarily at a rate exceeding the contract rate. Based upon the foregoing, the court interprets CCC's legal position to be that, because it is entitled to a greater rate of interest than is provided in the plan, it opposes confirmation. CCC

has formally requested an evidentiary hearing in the event that the court requires evidence of lending rates for similar loans.

3. In *United Savings Ass'n of Texas v. Timbers of Inwood Forest*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) Justice Scalia, writing for the unanimous Court, noted that the language set forth at Code § 1129(b)(2)(A)(i)(II), which is substantively identical to the language of Code § 1325(a)(5)(B)(ii) at issue here, entitles a secured creditor to the present value of its collateral. *Id.* at 377, 108 S.Ct. at 633–34. There is no dispute between the parties that the Code entitles the holder of a secured claim to the present value of its claim as of the effective date of the plan.

court is to ascertain the appropriate interest rate required to provide present value.

Unfortunately, "present value is not necessarily a legal concept, but rather a term of art used by the economic and financial communities." *In re Snider Farms, Inc.*, 83 B.R. 977, 988 (Bankr.N.D.Ind.1988). Courts, including the Second Circuit Court of Appeals, are virtually unanimous in interpreting present value to require a "market rate" of interest. *In re Bellamy*, 962 F.2d 176, 185 (2d Cir.1992). This only begins the inquiry, however.

■ Reasoning that present value requires a "market" rate of interest, courts have entertained evidence and engaged in analysis of specific risks, markets, debtors, collateral and lenders. *See e.g., In re Cellular Information Systems, Inc.*, 171 B.R. 926 (Bankr.S.D.N.Y.1994). Bankruptcy courts, notwithstanding that they are "neither bankers nor lenders and do not have the expertise to set interest rates" (*Hardzog v. Federal Land Bank of Wichita*, 901 F.2d 858, 860 (10th Cir.1990)), found themselves considering many of the same factors which lenders consider in the context of credit decisions. Such case-by-case examination of the specific factors which should properly comprise a lender's lending decision is beyond the expertise of the judiciary, unduly time consuming and likely to result in unrealistic or inconsistent findings.

This court rejects the notion that Congress intended bankruptcy courts (pursuant to Code § 1325(a)(5)(B)(ii)) to ascertain, using the same criterion as any prudent lender, the proper post-petition interest rate *vis a vis* each particular debtor and secured claim holder. Litigating the factors bearing upon a particular lender's "market" interest rate in each chapter 13 case where a debtor's vehicle is encumbered with a prepetition consensual lien (which is virtually *every* case) would constitute expensive, burdensome and continual litigation of the issue. Such an unwieldy result is, in itself, evidence that Congress could not have intended the present value provision in the Code to require a *sui generis* "market rate" determination con-

cerning the particular secured creditor in each case. Due to these considerations, it is in the interest of debtors, creditors and courts to determine, to the extent practicable, an objective proxy for the present value discount rate which is both easily ascertainable and responsive to market conditions. *See generally,* C. Frank Carbiener, *Present Value In Bankruptcy: The Search For An Appropriate Cramdown Interest Rate*, 32 S.D.L.Rev. 12 (1987) (hereinafter "*Carbiener*").

■ However, a review of the case law reveals that many courts, having accepted the premise that the present value discount rate must be a "market" rate, conclude that it requires the determination of a rate for similar loans by that lender or other lenders in the region. *See United Carolina Bank v. Hall*, 993 F.2d 1126 (4th Cir.1993); *In re Jones*, 999 F.2d 63 (3d Cir.1993); *In re Monnier Bros.*, 755 F.2d 1336 (8th Cir.1985).[4] Some proponents of this theory analogize the cramdown scenario to a new extension of credit postpetition; the so-called "coerced loan" or "new loan" theory. *See e.g. In re Jones, supra.* The coerced loan theory is the notion that "by compensating the secured creditor at the rate it would voluntarily accept for a loan of similar character, amount and duration that the creditor can be placed in the same position he would have been in but for the cramdown." *Id.* at 67.

■ This court declines to adopt the coerced loan theory for the reasons discussed below. First, it is misleading to analogize a so-called "cramdown" to a new post-petition extension of credit. It is neither consensual, contractual nor a loan but, rather, exclusively a creature of statute. A cramdown is nothing more or less than a secured "claim" (*see* Code § 101(5)) which must be treated, in the instant case, in accordance with Code § 1325(a)(5)(B)(ii). *See In re Smith*, 178 B.R. 946, 951 (Bankr.D.Vt.1995).

■ The coerced loan theory is based upon fictional premises. The Code's present value provisions require that the secured claim holder be compensated for the delay in not receiving the amount of the allowed se-

4. See CCC's Post Hearing Memo of Law at 4.

cured claim "in full immediately upon confirmation" 5 King L., COLLIER ON BANKRUPTCY ¶ 1325.06[4][b][iii][B]. Thus the Code protects only the amount of the allowed secured *claim*. However, courts favoring the coerced loan theory impermissibly recast present value "so as to preserve the present value of the loan" as opposed to the secured claim. Zywicki, T., *Cramdown And The Code: Calculating Cramdown Interest Rates Under The Bankruptcy Code* 19 T.Marshall L.Rev. 241, 252 (Spring 1994) (emphasis added) (hereinafter *"Zywicki"*). This is contrary to well-settled law that the "Bankruptcy Code protects the creditor's interest in the *property*, not in the creditor's interest in the profit it had hoped to make on the loan." *In re Hudock*, 124 B.R. 532, 534 (Bankr.N.D.Ill. 1991) (emphasis added).

■ The premise adopted in *Jones*, to wit, that the objective of the Code's present value provision is to place the secured creditor "in the same position he would have been in but for the cramdown" (*Jones*, 999 F.2d at 67), profoundly misstates the present value concept.[5] Generally, the purpose of the Code is to rehabilitate *debtors*—not creditors. It offers no protection from cramdown to the undersecured claim holder and no protection from modification to the secured claim holder. The secured claim holder is entitled to only the retention of its lien and present value of its claim (where the collateral is not surrendered). *See* Code §§ 1129(b)(2)(A)(i) and 1325(a)(5)(B). The only claim protected from modification or cramdown is one secured by a debtor's principal residence. *See* Code §§ 1123(b)(5) and 1322(b)(2); *Nobelman v. American Savings Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). No such protection is accorded other secured claims post-confirmation. Thus, contrary to the reasoning in *Jones*, a secured claim subject to the Code's present value provision is *not* entitled to treatment which would place the particular claimant in the "same position

it would have been but for the cramdown." It is subject to modification (albeit while retaining the lien) and entitled only to present value.

■ Second, the coerced loan theory is without statutory support. *See In re Computer Optics, Inc.*, 126 B.R. 664, 671 (Bankr. D.N.H.1991) (engaging in fact specific risk analysis to determine present value requires a "quantum leap"). The factors considered by the *Jones* court in the context of a present value determination included the absence of an "equity cushion", debtor's credit history, lender's profit and finance charges. However, the time value of money is affected by the *Jones* factors only if the purpose of Code § 1325(a)(5)(B)(ii) is to readjust the debtor-creditor relationship between the particular parties so as to make the terms of the "coerced loan" as close as possible to a tenable lending decision outside of a bankruptcy context and preserve that lender's contract "market" rate of interest i.e., profit. The plain language of Code § 1325(a)(5)(B)(ii), however, conveys no such intent. *See In re Ivey*, 147 B.R. 109, 115–116 (M.D.N.C.1992).

Had Congress sought to provide holders of secured claims with their original contract rate of interest or a rate of interest that reflects the current fair market, it would have employed language substantially different from that set forth in the existing "present value" provision. Compare the language of Code § 506(b) requiring payment of "interest on such claim ... provided for under the agreement" (contract rate) and of Code § 362(d)(3)(B) requiring "interest at a current fair market rate" (current rate on similar loans) with the present value language of Code § 1325(a)(5)(B)(ii). The absence of similarity between the sections is informative. It is a fundamental premise of statutory construction that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Con-

5. Compare the *Jones* premise to that set forth in 5 King, L. COLLIER ON BANKRUPTCY ¶ 1325.06[4][b][iii][B] at 1325–50 (15th ed. 1995) which provides that "[t]he purpose of the present value requirement is to place the holder of an allowed secured claim in the position economically as if the debtor ... received in full immedi-

ately upon confirmation" the amount of the secured claim and to compensate the creditor if it must obtain the funds elsewhere. The COLLIER present value formulation, in this court's view, is better stated and more faithful to the plain language of the statute than the *Jones* formulation.

gress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983); *United States v. Hopkins,* 853 F.2d 118, 119 (2d Cir.1988); *In re Operation Open City, Inc.,* 170 B.R. 818, 823 (S.D.N.Y.1994).

Congress could have used language quite different from that presently found in Code § 1325(a)(5)(B)(ii). For instance, Congress could have required that, in the event that a debtor proposes to make periodic cash payments over time to the holder of an allowed secured claim, that the claim holder receive interest on its secured claim as of the effective date of the plan at a rate (i) *set forth in the agreement or under applicable nonbankruptcy law,* (ii) *equal to the current fair market rate,* or (iii) *that it, or a similar lender in the region, would voluntarily accept under the circumstances of the particular case.* However, Congress did not choose any of the above (or anything similar) pertaining to the treatment of certain secured claims post-confirmation. "Congress considers present value and market rates to be different concepts and provides for market rates when it so intends." *In re Yrlas,* 183 B.R. 119, 122 (Bankr.N.D.Tx.1995). Therefore it would be erroneous to give Code § 1325(a)(5)(B)(ii) a meaning which Congress could have, but decided not to adopt.

Proponents of the coerced loan theory fail to acknowledge the disparity in language, and worse, read the present value language to possess a meaning indistinguishable from the above cited provisions of Code §§ 362(d) and 506(b). The fact that Congress chose not to use the language found in Code §§ 362 and 506 (or similar language) strongly indicates that it did not intend the present value language found in Code § 1325(a)(5)(B)(ii) to require a rate of interest at either "current fair market rate" or "provided for under the agreement." Accordingly, secured claim holders are not entitled to preservation of the value of their *loan* but, rather, the present value of their collateral.[6]

The *Jones* court (and other courts) have ignored the distinction between the discount factor required for present value under Code § 1325(a)(5)(B) and the interest concepts described by Congress in Code §§ 362(d)(3) and 506(b). The coerced loan theory reflects a revisionist departure from both the text and purpose of the statutory present value requirement. Those courts adopting the coerced loan theory, which seeks to preserve the lender's voluntary lending rate, appear to be using the admittedly vague statutory present value language as an opportunity to fashion what they believe is a fair and equitable outcome. However, in doing so courts have blurred the distinction between the "time value of money" concept and other distinct and separately codified interest concepts. Thus, the coerced loan theory is constructed more upon *ex post facto* perceived equitable considerations than sound statutory grounds. In this court's view, a discussion of the various reasons why the coerced loan theory may be more wise and just than an objective present value analysis "is one for the legislature, not the courts, to make." *Bellamy,* 962 F.2d at 186.

## II.

There are many market rates and determining the appropriate discount rate requires examination of their underlying characteristics. *See In re Smith,* 178 B.R. at 954–56; *In re Ivey,* 147 B.R. at 113. Lengthy discussions of various interest rates have been undertaken elsewhere and will not be reiterated herein.[7] Typically, a retail in-

6. The criticism drawn by this approach to present value is that it may result in a "windfall" to debtors at the expense of lenders. However, "Congress frequently rewards certain individuals and groups ... with favorable rates. Debtors under Title 11 of the United States Code are among those singled out for special treatment." *In re Smith,* 178 B.R. at 954. *See also United Savings Ass'n of Texas v. Timbers of Inwood Forest,* 484 U.S. 365, 379, 108 S.Ct. 626, 634, 98 L.Ed.2d 740 (1988) ("That secured creditors do not bear one kind of reorganization cost hardly means that they bear none of them").

7. Interest rates and their components are discussed in detail in Carbiener, *Present Value In Bankruptcy, supra; In re Smith, supra; In re Ivey, supra; In re Wilkinson,* 33 B.R. 933 (Bankr. S.D.N.Y.1983) and *In re Fisher, supra.* Generally, the recipe for an interest rate includes varying amounts of (i) pure interest, (ii) inflation premium, (iii) default premium, (iv) liquidity premium

terest rate includes "costs of administration, profit and other elements not applicable in the bankruptcy context." *Carbiener, supra* citing *In re Fisher,* 29 B.R. 542, 544 (Bankr. D.Kan.1983).

A discount rate for the purpose of present value under the Code properly consists of two components: (i) a riskless rate of interest, and (ii) additional interest to compensate for the risk of the post-confirmation default. *Fisher,* 29 B.R. at 543. Upon review of the applicable case law, this court is persuaded that the rate on a United States Treasury instrument (with a maturity that best matches the proposed payout term on the allowed secured claim) with up to a three percent risk premium both provides present value and facilitates the expedient administration of cases. The applicable Treasury rate is virtually riskless and also reflects permissible premiums for inflation and maturity. *In re Smith,* 178 B.R. at 956.

*Collier's* suggests that the "cost of funds" method best conforms with the purpose of the Code's present value provision. *See* 5 King, L., COLLIER ON BANKRUPTCY ¶ 1325.06[4][b][iii][B]. The cost of funds approach to present value seeks to compensate the secured claim holder for the cost of obtaining the funds elsewhere. *Id.* Most significantly, it rejects the basic premise of the coerced loan approach that the lender's retail lending market is the relevant "market" for the determination of present value. The cost of funds approach correctly aims at providing the creditor with the time value of its money rather than preserving the value of its original loan (or a fictitious post-petition loan). "[T]he relevant *market* rate is not the rate being *charged* by [the lender] for similar loans, rather, it is the rate *paid* by [the lender] for the funds it borrows" (emphasis in original). *GMAC v. Valenti,* 95–CV–760 (N.D.N.Y. October 13, 1995, Cholakis, J. at 3).

However the cost of funds approach has several drawbacks. Because the rate of interest paid by lenders is not always uniform, an evidentiary hearing would be required to determine the cost of funds in each case thereby frustrating the goals of efficiency and economy. Sometimes a secured claim holder is not a typical lender.[8] Thus the cost of funds approach introduces uncertainty as well as costly and time-consuming litigation into a process that should be objective and streamlined.

In *Valenti* the District Court correctly rejected the current retail lending rate available to consumers outside bankruptcy as determinative of the rate required to provide present value. In order both to remain faithful to *Valenti's* rejection of the retail lending rate and to eliminate continual litigation of each secured claim holder's cost of funds, the court has adopted a rate of interest based upon the Treasury rate.

Fortunately, the Treasury rate is "usually the same" as the creditor's cost of borrowing (*Carbiener, supra*), but preferable because it; (i) does not invite an evidentiary hearing for the purpose of rendering a *sui generis* determination regarding each particular creditor's cost of funds, (ii) is objective, readily ascertainable and (iii) is responsive to market conditions. *See In re Caudill,* 82 B.R. 969, 980–81 (Bankr.S.D.Ind.1988); *In re Corliss,* 43 B.R. 176 (Bankr.D.Or.1984); *In re Frost,* 47 B.R. 961 (D.Kan.1985); *In re Willis,* 6 B.R. 555 (Bankr.N.D.Ill.1980). While the cost of funds approach appropriately seeks to compensate the creditor for having to replace the unavailable funds, it is contrary to the goal of providing an objective, easily ascertainable riskless rate which is responsive to the market and proposed payout term. Moreover, a uniform, easily ascertainable rate for the determination of present value enhances the predictability and economy of present value determinations.

---

and (v) maturity or risk premium. *In re Smith,* 178 B.R. at 954 citing Weston J. and Brighan E., *Essentials Of Managerial Finance,* (10th ed. 1990). The amount of each component is dependent upon the particular market from which it is derived.

8. A strict cost of funds analysis could produce absurd results such as "award[ing] an oversecured government creditor a rate approximating zero because government has the power to extort funds from its citizens at little or no cost." *In re Smith,* 178 B.R. at 952.

■ Because the rate on Treasury instruments is virtually risk free, "a risk premium must be added to accurately reflect the risks inherent in receiving deferred payments under a reorganization plan." *Carbiener, supra; In re Fisher,* 29 B.R. at 551 (cases cited therein). While lenders may take a relatively dim view of such risks, the disclosure/confirmation process is designed to address those concerns. The Code requires the bankruptcy court to make findings that the confirmed Chapter 11 case is not likely to be followed by liquidation or further reorganization, and that the Chapter 13 debtor is financially able to make all payments.[9] *See* Code §§ 1325(a)(6) and 1129(a)(11). The disclosure and review mechanisms under the Code (*see* Code § 341(a); Rules 2004 and 4002) provide creditors with greater ability to ascertain the debtor's financial ability to service debt and otherwise perform as proposed in a plan.[10] As a result, post-petition debt service default risk should be less than that which generally exists prepetition. Because the risk of post-confirmation default is never wholly eliminated, an additional risk premium (of up to 3%) should take account of any residual post-confirmation default risk. *In re Yrlas,* 183 B.R. at 122 (Treasury plus 2%); *In re Wilmsmeyer,* 171 B.R. 61, 64 (Bankr. E.D.Mo.1994) (prime plus 3.5% by local rule); *In re Caudill,* 82 B.R. at 980 (Treasury plus up to 3%); *In re Smithfield Estates,* 52 B.R. 220 n. 5 (Bankr.D.R.I.1985) (Treasury plus 2%); *In re Fisher,* 29 B.R. at 543–44 (Treasury plus 1%). The addition of up to three percentage points for a risk premium will turn upon a showing that the Chapter 13 debtor is able to make all proposed payments (*see* Code § 1325(a)(6)). Accordingly, the greater the debtor's demonstrated financial ability to make the proposed payments, the less risk premium required. In the event that parties are not able to stipulate to an acceptable risk premium, the court will determine the appropriate risk premium through the confirmation process.

■ The Debtors' plan proposes to pay CCC's secured claim over 60 months at 11% interest. According to the *Wall Street Journal,* the Treasury rate for a security with a maturity of 60 months is 5.84% as of the approximate date of the hearing on confirmation. Assuming, *arguendo,* the maximum additional risk premium of 3%, CCC is entitled to receive payment of its secured claim with interest of 8.84%. Because Code § 1325(a)(5)(B)(ii) requires the Debtors to provide the claim holder with "not less than" the present value of the allowed secured claim, the Debtors' proposal to pay CCC's secured claim at 11% interest *more* than satisfies their statutory obligation to CCC with regard to its secured claim. Accordingly, CCC's objection to confirmation of Debtors' plan, grounded upon its claimed statutory entitlement to receive its secured claim with interest at 15.10%, is unfounded.

### III.

■ Having determined that the Debtors' proposal to pay CCC's secured claim with interest at 11% satisfies their statutory obligation to provide CCC with not less than the present value of its secured claim, the court turns to the Trustee's objection that the Debtors' proposal to pay CCC *more* than present value of its secured claim while paying only 10% of all unsecured claims constitutes a violation of Code § 1325(a)(3) warranting denial of confirmation.

■ It is not disputed herein that the Trustee possesses standing to raise and be heard on objections to confirmation of plans. *See* Code § 1302(b)(2)(B). Indeed, it is the Trustee's *duty* to review plans to determine if the requirements of confirmation are met and to make a recommendation to the court either opposing or supporting confirmation. *In re Foulk,* 134 B.R. 929, 931 (Bankr.D.Neb. 1991). Generally the Trustee's efforts advance or defend the rights and treatment of

---

9. "The principal criterion to be satisfied in order to promote the prospects for success in Chapter 13 cases is [the requirement] that the court determine that 'the debtor will be able to make all payments under the plan and to comply with the plan.' " 5 King, L., COLLIER ON BANKRUPTCY ¶ 1302.01 at 1302–18 (15th ed. 1995).

10. In addition, in a Chapter 13 context a wage order may be implemented which virtually eliminates the risk of inadvertent default.

unsecured creditors under the plan. As observed in *Foulk*, "[t]he unsecured creditors often have such small claims and such a low expectation of any payment that they do not retain counsel and they do not object to confirmation. The Chapter 13 standing trustee is paid from the bankruptcy estate, and the trustee has fiduciary duties to creditors." *Id.* at 931.

Here, the Trustee correctly has objected to the Debtors' proposal to overpay CCC on its secured claim at the expense of their unsecured creditors. In the plan *sub judice* Debtors propose to pay unsecured creditors only 10% on their allowed claims. Because the amount of Debtors' disposable income, i.e., all funds above necessary expenses which are devoted to payments under the plan (*see* Code § 1325(b)(2)), is in theory a fixed monthly sum, each dollar paid to CCC on its secured claim in excess of that required to provide it with present value, deprives unsecured creditors of a dollar to which they are collectively entitled.

This amounts to the preferential treatment of one creditor at the expense of the class of unsecured creditors.[11] The fundamental policy underlying the Code disfavors such inequitable treatment of creditors. A debtor's preferential treatment of a single creditor "diminishes [the debtor's] assets to the detriment of his other creditors." Report of the Commission, H.R.Doc. No. 93–137, 93d Cong., 1st Sess., Pt. I at 202 (1973). In effect, the Debtors seek the court's blessing of a plan which proposes inequitable treatment of their creditors. As the court views the Debtors' instant plan as inconsistent with the basic tenants of the Code it must conclude that it was not proposed in good faith and does not satisfy Code § 1325(a)(3).

Based upon the foregoing reasons, confirmation of the Debtors' plan is hereby denied.

**IT IS SO ORDERED.**

---

11. Clearly, the Trustee's objection would not lie if the Debtors had proposed a feasible plan to pay all unsecured claims in full over 36 months. *See* Code § 1325(b)(1)(A). In that event, unsecured creditors could not show any prejudice resulting from paying more than present value on an allowed secured claim.