In re Pasquale J. & Vatsala
VESCIO, Debtors.

AMRESCO NEW ENGLAND II,
L.P., Creditor/Appellant,

v.

Pasquale J. & Vatsala VESCIO,
Debtors/Appellees, Counter-
claim Plaintiffs.

Bankruptcy No. 96–10153.

United States Bankruptcy Court,
D. Vermont.

Nov. 20, 1998.

M. Carter, M.P. Kehoe, P. Saxer, Saxer
Anderson Wolinsky & Sunshine, PC, Bur-
lington, VT, for AMRESCO New England II,
L.P. ("AMRESCO").

J. Schwidde, Glinka & Schwidde, Rutland,
VT, for Debtors Pasquale J. and Vatsala
Vescio ("Debtors").

## MEMORANDUM OF DECISION AFTER REMAND ON VALUATION AND COMPUTING RISK PREMIUM

FRANCIS G. CONRAD, Bankruptcy
Judge.

On appeal to the District Court, our Au-
gust 19, 1996, "Order Confirming Third
Amended Chapter 11 Plan" was reversed in

part and remanded by "Omnibus Order" dated June 16, 1997. Judge Sessions' order requires [1] "further proceedings on the following two issues:"

    A. Determination that the applicable interest rate ... established in accordance with *In re Smith,* 178 B.R. 946 (Bankr. D.Vt.1995), which resulted in an interest rate of 6.36 percent, remains valid in light of the recent decision by the United States Court of Appeals for the Second Circuit in the case of *In re Valenti,* 105 F.3d 55, (1997).

    B. Determination that the value of the Phase II property was $850,000.00.

Omnibus Order, Doc. No. 326–1, 2. We will address the issues in reverse order, discussing valuation first, then the continuing propriety of the confirmation interest rate on AMRESCO's secured claim.

### VALUATION OF PROPERTY

■ We made our findings on valuation of the property securing AMRESCO's claim on the record at the August 12, 1996 hearing on confirmation of Debtors' Plan. As sometimes happens with oral findings, the words spoken were not as clear as the thoughts they were intended to express. Accordingly, we will restate our findings with greater clarity, so that the parties and any courts on appeal will have a clear understanding of what we decided and why.

The evidence and representations we heard at the August 12, 1996 hearing about the value of the property securing the debt to AMRESCO consisted of the following:

    1. $820,000–"X," where X equals "unknown costs" to comply with development commitments to the Town of Brattleboro. June 14, 1996 Appraisal of Bredice Appraisal Assoc., Inc., for AMRESCO, at 72.[2]

    2. $850,000, plus or minus $50,000, from the testimony of the debtor, Pasquale J. Vescio. Tr., at 55. In addition, Vescio estimated X, the cost of completing items in his development agreement with the Town of Brattleboro, at $100,000. Tr., at 64. A fair inference from the context of his testimony is that $850,000 is the value he attributes to the property knowing that $100,000 in improvements still must be made to comply with obligations to the Town. *Compare* Tr., at 54–55, *with* Tr., at 61–64.

    3. $950,000 town tax appraisal, which we assumed, for purposes of discussion, probably was not discounted for X. Representation of AMRESCO's counsel, Gail Westgate, Tr., at 34; Tr. at 59.

    4. $1,040,000, with no deduction for X, from a report that aptly describes itself as a "limited" "value estimate." August 1, 1996 Value Estimate of R. Russell Rice for AMRESCO, at 24.

We accept Debtor's testimony as the best evidence both of the value of his property and the value of "X." We find him to be a credible witness who resists the temptation to exaggerate when it would be in his interest to do so. His testimony was well within the range of the evidence provided. Although we think his value may be a bit high, we accept it nonetheless, because the upward drift favors AMRESCO and, as we will see, $850,000 results in fair compensation to AMRESCO for the "double risks" it faces as a result of Debtors continued use of the property. *See, Associates Commercial Corp. v. Rash,* — U.S. —, —, 117 S.Ct. 1879, 1885, 138 L.Ed.2d 148 (1997).

The $820,000–X value from AMRESCO appraiser Bredice, which is thorough and conservative, was criticized by AMRESCO's second appraiser, Rice, and was not defended by Debtor. Discounting for X by $100,000 would reduce the value to $720,000. This seems to us a reasonable estimate of the low end of the range, and would do nicely as a "liquidation" value.

---

**1.** Our subject matter jurisdiction over this controversy arises under 28 USC § 1334(b) and the General Reference to this Court under Part V of the Local District Court Rules for the District of Vermont. This is a core matter under 28 USC §§ 157(b)(2)(A), (B), (K), (L),· and (O). This Memorandum of Decision constitutes findings of fact and conclusions of law under Fed.R.Civ.P. 52, as made applicable by Fed.R.Bankr.P. 7052.

**2.** We admitted the Bredice Appraisal for AMRESCO as an admission against interest. Transcript of 8/3/96 hearing, 14–15 ("Tr.").

At the hearing, we noted that if an X of $100,000 were subtracted from the Town of Brattleboro tax valuation of $950,000, the result would equal Debtor's $850,000 estimate. As noted at the hearing, "I have really no basis for that valuation other than I assume Brattleboro like most towns had an appraisal and the listers did it and so on." Tr., at 117. We did not rely on this decorative point for our conclusion as to value.

The high end of the valuation spectrum was the $1,040,000 limited value estimate by Rice for AMRESCO. We find that the Rice value is not credible, because it is incomplete and fails to account for relevant issues affecting value. Rice did not have time to complete a full appraisal comparing the three customary methods for valuation—sales comparison, cost approach and income approach. AMRESCO retained Rice shortly before the hearing, leaving him with only enough time to prepare an estimate of value using the income approach. Rice Depo., at 12–13, 47–48. Although he defended it as "the most appropriate approach" at his deposition, he also conceded, "It would not be proper for me to say what the results of a complete appraisal would be if I haven't performed them." Rice Depo., at 14. Indeed, Rice acknowledges in his appraisal, Rice Report, at 4, that the Uniform Standards of Professional Appraisal Practice required him to state, "This appraisal's value analysis is limited to a development of the Income Approach, and thus cannot carry the same level of reliability as could an appraisal utilizing two or more approaches." *Id.,* at 7.

Rice's value estimate is also suspect because it fails to account for significant issues affecting value. For example, Rice's selection of a discount rate was based on a dubious assumption that failed to address actual risks.

> The majority of the property's cash flow is based on a long term lease at market rates for a use which is unlikely to be discontinued. The balance of the property, however, would be viewed as more risky than typical, with vacant space requiring owner investment to acquire the income stream.

Rice Report, at 19. In fact, the validity of the lease is now before us in a related adversary proceeding. At the time of the hearing, Debtor and tenant were tendentiously disputing amounts due under the lease. Tr., at 64. As Rice conceded, these matters "would probably change the discount rate." Rice Depo., at 81. Using a higher rate that more accurately reflected the risks apparent at the time of confirmation would reduce his estimate of value.

Another significant omission in Rice's report is his failure to account for X. His "report was made with an extraordinary assumption," that the property was "free and clear" of any obligation "to satisfy the Town of Brattleboro in the matter of unmet development agreements." Rice Report, at 5. He acknowledged that "there is certainly a cost there," but contended, "It can't be quantified." Rice Depo., at 79. Based on the Debtor's testimony, we have quantified X at $100,000, Tr., at 63–64.

To reiterate, we believe that the best evidence of the value of the property securing AMRESCO's claim is the testimony of Debtor Pasquale Vescio. Accordingly, we find that the value of the property is $850,000.

## INTEREST RATES

The Second Circuit ruled in *Valenti supra,* 105 F.3d at 64 that secured creditors are entitled to receive a risk premium on top of the market interest rate to "reflect the risk to the creditor in receiving deferred payments under the reorganization plan." The Supreme Court, in *Rash,* required that the underlying collateral be valued at replacement value, rather than liquidation value, to protect secured creditors from the "double risks" that the debtor "may again default and the property may deteriorate from extended use." *Rash, supra,* —— U.S. at ——, 117 S.Ct. at 1885. The Supreme Court succinctly stated that "the replacement-value standard accurately gauges the debtor's 'use' of the property," while "[a]djustments in the interest rate . . . do not fully offset these risks." *Id.* We suggested in *In re Goodyear,* 218 B.R. 718, 721–22 (Bankr. D.Vt.1998) that *Rash* had implicitly modified the Second Circuit's risk premium requirement, by requiring that it be accounted for in

valuation rather than in determination of the proper interest rate.

AMRESCO concedes that *Rash* modifies *Valenti*, but argues that *Rash* affects only the portion of risk connected with depreciation.

> *Rash* requires ... that in a Chapter 13 cram down, the creditor be compensated for the debtor's continued use of the creditor's property by applying a replacement value standard in valuing the creditor's claim. Other risks to the creditor, however, including the risk of default by the debtor, must still be compensated by adding a risk premium component to the rate of interest paid on the claim.

AMRESCO's Supplemental ·Memorandum, Doc. # 389–1, 7. AMRESCO is mistaken. Justice Ginsburg's opinion for the majority clearly applies to both risks, depreciation in value and default. Judge Ginsburg addressed both risks from the debtor's continued use:

> If a debtor keeps the property and continues to use it, the creditor obtains at once neither the property nor its value and is exposed to double risks: The debtor may again default, and the property may deteriorate from extended use. Adjustments in the interest rate and secured creditor demands for more "adequate protection," 11 U.S.C. § 361, do not fully offset these risks.... Of prime significance, the replacement-value standard accurately gauges the debtor's "use" of the property.

*Rash, supra,* —— U.S. at ——, 117 S.Ct. at 1885. If "the replacement-value standard accurately gauges the debtor's 'use' of the property," then adding a risk premium to the interest rate would unlawfully prefer secured creditors, compensating them twice for the same risks. Accordingly, we hold that *Rash* requires that the "double risks" from a debtor's continued use of the property be accounted for in the valuation process, by using the "replacement value standard" to value property to be retained by the debtor, *id.,* —— U.S. at ——, 117 S.Ct. at 1886. *Rash*

> leaves to bankruptcy courts, as triers of fact, identification of the best way of ascertaining replacement value on the basis of the evidence presented. Whether replacement value is the equivalent of retail value, wholesale value, or some other value will depend on the type of debtor and the nature of the property.

*Rash, supra,* —— U.S. at ——, 117 S.Ct. at 1886 n. 6. By "replacement value," the Supreme Court means "the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition."[3] *Id.,* —— U.S. at —— n. 2, 117 S.Ct. at 1884 n. 2.

■ As AMRESCO points out, the methodology employed by its rate expert, Jeffrey B. Carr, "takes into account the various risk factors applicable to the Phase II property— its size, location, history, and tenancy—which are identical or equivalent to those factors considered in the two appraisal reports on the same property." AMRESCO's Supplemental Memorandum, 3. Thus, it is apparent that Justice Ginsburg's prescription is accurate: We can take account of appropriate risk factors in the valuation process. The

---

3. The Court's definition of "replacement value" is similar to, but distinct from, the boilerplate definition of "market value" used in both the Bredice and Rice appraisals:

> the most probable price which a property would bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:
> (1) Buyer and seller are typically motivated;
> (2) Both parties are well informed or well advised, and acting in what they consider their own best interests;
> (3) A reasonable time is allowed for exposure in the open market;
> (4) Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
> (5) The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

Bredice Appraisal, at 12; Rice Report, at 6. The Court's definition of "replacement value" takes into account "the debtor's ... situation," while "market value" assumes a "typically motivated" buyer.

way the appraisers took account of them, however, was by increasing the capitalization rates they used, which served to diminish the property's value. The Supreme Court in *Rash* and the Second Circuit in *Valenti* have said that secured creditors must be compensated for the risks that AMRESCO's appraisers have subtracted out from value. Accordingly, we must identify the components of the rates that deal specifically with the inherent risks to AMRESCO from Debtors' plan, and somehow add the amount of value discount they represent back into the calculations of value.

It is difficult to subtract out those risk components from the rates proposed by AMRESCO's rate expert and its two appraisers. Rate expert Carr identified the Industry/Interest Specific Risk as 4% of the 21.4% return that equity would require for the 25% of the investment that he allocated to equity.[4] The 4% risk factor makes a weighted contribution to Carr's capitalization rate of only 1%, because it is included only in the 25% of investment allocated to equity. Carr's discussion of what his risk factor contains is not sufficiently well defined to permit us to rely on it with confidence that it includes what belongs and excludes what doesn't. *See,* Carr Report, at pages 3–5 and Exh. I.

Rice suggests that the "expense of and the risk inherent in completing, holding and leasing the vacant portion of the property" is 2.43%. Rice Report, at 20. That definition of risk, however, is too large. We are looking only for the particular risks associated with Debtor's use of the property, not the risks inherent in the property itself.

The Bredice Appraisal includes the "risk characteristics" of the property in its recommended capitalization rate of 14%, but does not provide detail sufficient for us to attribute a specific number to it.

We believe the best evidence of the Debtor-specific risks is the report of Debtor's rate expert, James B. Lurie. Unlike AMRESCO's experts, who persist in futile and, in our view, discredited[5] attempts to factor in the secured creditor's costs and profits, Lurie attempted to identify a risk premium that accounted only for the risks of nonpayment specific to the Debtor's situation: "1) the level of debt service coverage, 2) the assurance of the continuation of the revenue stream, and 3) the secured position of the creditor." Lurie 11/13/97 Letter, at 2. These factors implement *Valenti's* requirement that the risk premium account for "the circumstances of the debtor." *Valenti, supra,* 105 F.3d at 64. They also account for the "double risks" cited in *Rash,* that "the debtor may again default, and the property may deteriorate from extended use." *Rash, supra,* —— U.S. at ——, 117 S.Ct. at 1885. We endorse both Lurie's method and his result.

The core of both *Smith* and *Valenti* is that the appropriate rate to compensate a secured creditor be limited. The rate cannot include elements of profit, and it cannot include elements of a lender's costs.... [T]he only fair indicator of spreads reflecting only the risk of non-

---

4. "The methodology employed by Carr recognizes the different level of risk typically ascribed between "debt" and "equity" components of an investment," allocating 75% to debt and 25% to equity. AMRESCO's Supplemental Memorandum, at 2. Bredice and Rice used the same methodology, with slightly different weightings. Bredice allocated 67% to debt and 33% to equity. Bredice Appraisal, at 58. Rice, using a 7–year "yield analysis," weighted debt at 75% over the first five years and at 67% the last two years, with the balance in each case allocated to equity. Rice Report, at 20.

In each case, the experts determine the appropriate return for debt and for equity. The weighted average of those returns is the capitalization rate.

5. "[T]he value of a creditor's allowed claim does not include any degree of profit. There is no reason, therefore, that the interest rate should account for profit. *See* [*In re Dingley,* 189 B.R. 264, 269 (Bankr.N.D.N.Y.1995)]; *see also In re Smith,* 178 B.R. 946, 951 (Bankr.D.Vt.1995) (distinguishing a creditor's "claim" under § 1325(a)(5)(B)(ii), which includes a statutory obligation to pay interest, from a loan, which "includes a contractual obligation to pay interest"); *In re Hudock,* 124 B.R. 532, 534 (Bankr. N.D.Ill.1991) ("[T]he Bankruptcy Code protects the creditor's interest in the property, not the creditor's interest in the profit it had hoped to make on the loan."). Otherwise, the creditor will receive more than the present value of its allowed claim. *See In re Cellular Info. Sys., Inc.,* 171 B.R. 926, 939 (Bankr.S.D.N.Y.1994)." *Valenti, supra,* 105 F.3d at 64.

payment is the bond market, which lacks all of the elements specifically excluded in both *Smith* and *Valenti*. There are published indices of interest rates for numerous types of securities. Unfortunately, there is no such published index for real-estate secured bankruptcy claims. We therefore must consider the similarities and differences between the elements present in the Vescio loan to the elements in a security in order to come up with a reasonable spread over the risk free rate.[6]

Lurie 3/7/98 Letter, at 2. For his analysis, Lurie chose Baa-rated securities, defined by Moody's Investors Service as

> medium-grade obligations (i.e. they are neither highly protected nor poorly secured). Interest payments and principal security appear adequate for the present but certain protective elements may be lacking or may be characteristically unreliable over any great length of time. Such bonds lack outstanding investment characteristics and in fact have speculative characteristics as well.

*Id.* As Lurie points out, "secured" in the Moody's definition refers to risk of loss, not to the existence of collateral. *Id.* The existence of collateral "gives an element of security to the Vescio loan above what might be afforded an investor in a Baa debenture." *Id.* Offsetting risks of loss under Debtors' plan that Lurie identifies are: 1) "there is only a single tenant" which "materially increases risk." 2) "The specific single tenant is a regional entity" whose "ability to pay its obligations . . . is not supported by the broad scope of the national economy." 3) Debtor's ability "to lease up the space not leased . . . is a function of the Brattleboro real estate market, which is somewhat thin." *Id.,* at 3.

On balance, Lurie concluded, Debtor's Plan "has risk characteristics in excess of those prescribed in the definition of a Baa security, mainly as a result of the single tenant of the building." *Id.* Accordingly, Lurie's opinion and our finding is that "the appropriate risk premium" is 1.875%, which is greater than the 1.54% spread between

risk-free yields on treasury rates, and the yield on Baa securities. *Id.*

We note in the first instance that, properly weighted, all three estimates of the appropriate risk premium fall within the 1–3% range *Valenti* described as reasonable. *Valenti, supra,* 105 F.3d at 64. The appraisers have reduced the value of the property to reflect the risk. In a voluntary market transaction, this would result in increased yields from risky investments. *Rash,* however, requires that property be valued to protect secured creditors from the risks the appraisers have taken out. Accordingly, we must assure that the property's value includes, not excludes, the component of risk specific to the Debtor.

The Supreme Court has left it to the "bankruptcy courts, as triers of fact, [to] identif[y] the best way of ascertaining replacement value on the basis of the evidence presented." *Rash, supra,* —— U.S. at —— n. 6, 117 S.Ct. at 1886 n. 6.

We believe that, on this record, the best way to ascertain replacement value is to work backward from the Bredice Appraisal, using the methodology employed by AMRESCO's experts, to put back in to the estimate of value the risk premium as calculated by Lurie. As noted earlier, we believe the Bredice appraisal of $820,000–X is sound. Although not defended by Debtor, the criticisms by Rice served, as we noted on the record, to strengthen the Bredice result. *See,* Tr., at 119–22. We also believe that the Rice appraisal, if corrected as indicated above, would be in the same valuation neighborhood as the Bredice Appraisal.

We found X to be $100,000, so we begin with $720,000 as the value that the market would give the property in order to assure investor yields that reflected all relevant risks. Both AMRESCO appraisers used a capitalization rate of 14%. Carr, AMRESCO's rate expert, concluded that an interest rate of 13% was necessary to assure market yields sufficient to cover all relevant risks.

The two appraisers estimated annual earnings, then divided the estimate by the capitalization rate to come up with their ap-

**6.** The risk-free rate in this case was set at confirmation at 6.36%, according to the procedure established by *Smith, supra,* 178 B.R. at 956, and endorsed by *Valenti, supra,* 105 F.3d at 64.

praisal values. We begin with $720,000 and multiply it by the 14% capitalization rate, which yields $100,800.[7] Next, we reduce the capitalization rate by 1.875 percentage points to 12.125%, to back out the risks specific to the Debtors' plan. Finally, we divide the $100,800 intermediate figure by the revised capitalization rate, and come up with a replacement value that accounts for the debtor-specific risks of nonpayment: $831,-340, which we believe is within the price range "a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition." *Rash, supra,* —— U.S. at —— n. 2, 117 S.Ct. at 1884 n. 2.

### CONCLUSION

The best evidence of the property's value was the testimony of Debtor Pasquale Vescio. Based on his testimony, we find the value of the property to be $850,000.

The risk-free interest rate of 6.36% imposed at confirmation in accordance with *In re Smith*, remains valid in light of *Valenti* and *Rash*. *Valenti* and *Rash* both require that secured creditors be protected from the "double risks" of non-payment arising from cramdown under a Debtor's Plan—the risks of depreciation and default. *Rash* requires that the risk premium be built into the valuation process. Dealing with risk in this way, at least in the context of valuation of commercial real estate, is simple. It imposes no additional burdens on the Court or the parties, because identification of the risk factors is already part of the valuation process.

We conclude that valuing Debtors' property at $850,000 affords ample protection for AMRESCO to account for the double risks arising from Debtors' continued use of the collateral.

---

7. Although this is, basically, a meaningless, intermediate number, we note that it is nonetheless in the same ballpark as the $111,475 Bredice estimated as annual Net Operating Income before stabilized occupancy. Bredice Appraisal, at 67.